UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                              :

STEVEN GOLDSTEIN individually and on  :
behalf of CONGREGATION BNEI        :
MATISYAHU, and MEIR ORNSTEIN,   :
                               :          22-CV-8300 (VSB)

                   Plaintiffs,   :

                               :        **OPINION & ORDER**

           -against-         :

                               :
KATHY HOCHUL, in her official capacity as :
Governor of the State of New York; LETITIA :
JAMES, in her official capacity as Attorney :
General of the State of New York;       :
KEECHANT SEWELL, in her official    :
capacity as Commissioner of the New York :
City Police Department; LOUIS FALCO, III, :
in his official capacity as Rockland County :
Sheriff; ERIC GONZALEZ, in his official  :
capacity as the District Attorney of Kings  :
County; and THOMAS WALSH, II, in his  :
official capacity as the District Attorney of :
Rockland County.                 :
                   Defendants. :
                               :
                               :
-------------------------------------------------------- X

Appearances:

Cory Morris
Law Offices of Cory H. Morris
Hauppauge, New York

Ameer N. Benno
Benno & Associates P.C.
New York, New York
*Counsel for Plaintiffs*

Matthew Lawrence Conrad
New York State Office of the Attorney General
New York, New York

Nicholas Robert Ciappetta
New York City Law Department
Administrative Law and Regulatory Litigation Division
New York, New York

Thomas Edward Humbach
County of Rockland Department of Law
New York, New York

Patrick John Fischer
Office of the County Attorney
New City, New York
*Counsel for Defendants*

William James Taylor, Jr.
Everytown Law
New York, New York
*Counsel for Amicus, Everytown for Gun Safety*

VERNON S. BRODERICK, United States District Judge:

On September 29, 2022, Plaintiffs Meir Ornstein ("Ornstein") and Steven Goldstein

("Goldstein") individually and on behalf of Congregation Bnei Matisyahu (the "Congregation"

together with Ornstein and Goldstein, the "Plaintiffs"), initiated this action by filing a verified

complaint. On the same day, Plaintiffs filed a proposed order to show cause requesting a

temporary restraining order ("TRO") and preliminary injunction ("PI") enjoining Defendants

Governor Kathy Hochul ("Governor Hochul"), Attorney General Letitia James ("Attorney

General James" together with Governor Hochul, the "State Defendants"), Commissioner of the

New York City Police Department Keechant Sewell ("Commissioner Sewell")[1], District

---

[1] Commissioner Sewell announced on June 12, 2023 that she will be stepping down as Commissioner at the end of June 2023. See Chelsia R. Marcius, Maria Cramer & William K. Rashbaum, Inside the Turmoil That Led N.Y.P.D.'s Commissioner to Walk Away, N.Y. TIMES (June 13, 2023), https://www.nytimes.com/2023/06/13/nyregion/keechant-sewell-nypd-resignation.html; *see also* Ethan Stark-Miller, Dean Moses & Robert Pozarycki, Sewell Resigns as NYPD Commissioner, Following reported Tensions With City Hall, AM NY (June 12, 2023), https://www.amny.com/news/nypd-commissioner-sewell-resigns-city-hall-tensions/. When Commissioner Sewell's successor is named that person will be "automatically substituted as a party." Fed. R. Civ. P. 25(d).

Attorney of King's County Eric Gonzalez ("District Attorney Gonzalez" together with Commissioner Sewell, the "City Defendants"), Rockland County Sheriff Louis Falco, III ("Sheriff Falco"), and District Attorney of Rockland County Thomas Walsh, II ("District Attorney Walsh" together with Sheriff Falco, the "County Defendants") from enforcing New York Penal Law § 265.01-e(2)(c) (the "Challenged Provision"). On October 3, 2022, I denied Plaintiffs' request for a temporary restraining order for failure to show "immediate and irreparable injury sufficient to satisfy the stringent requirements for a temporary restraining order." (Doc. 21 at 1–2.) Currently before me is Plaintiffs' motion for a preliminary injunction. For the reasons set forth below, Plaintiffs' motion for a preliminary injunction is DENIED.

## I.     Procedural History and Background

On June 23, 2022, the Supreme Court of the United States struck down New York Penal Law § 400.00(2)(f) on the grounds that New York State's firearm licensing scheme violated the Second and Fourteenth Amendments by preventing "law-abiding citizens with ordinary self-defense needs" to bear arms in public for self-defense. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022); *see also Kachalsky v. Cnty. of Westchester,* 701 F.3d 81, 96 (2d Cir. 2012)*, abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022). New York Penal Law § 400.00(2)(f) required applicants to demonstrate a special need for self-defense distinguishable from that of the general community in order to be issued a public-carry license. The Court rejected the previous "two-step" framework, holding that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and that the Government may not justify regulation related to carrying a firearm on the basis that "the regulation promotes an important interest". *Id.* at 2125–26. Under *Bruen*, if a governmental entity wishes to regulate conduct covered by the

"plain text" of the Second Amendment, it must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

The Concealed Carry Improvement Act ("CCIA") was enacted on July 1, 2022 following an Extraordinary Session of the New York State Legislature convened on June 30, 2023 in response to the *Bruen* decision to address "necessary statutory changes regarding firearm safety". *See* Daphne Jordan, *Extraordinary Session in Extraordinary Times,* NYSENATE.GOV (2022), https://www.nysenate.gov/newsroom/articles/2022/daphne-jordan/extraordinary-session-extraordinary-times (last visited Jun 27, 2023). The CCIA states, in relevant part:

> A person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location.[2]

N.Y. Penal Law § 265.01-e(1) (2022). The CCIA made several changes to the licensing process to ensure that carry licenses would only be provided to law-abiding persons and narrowed the set of Sensitive Locations where carrying "a firearm, rifle or shotgun" would not be allowed. One of these Sensitive Locations included "any place of worship".[3] N.Y. Penal Law § 265.01-

---

[2] "Sensitive Location" will be used as a defined term in this Opinion & Order, and is the term used in the CCIA to describe the physical locations where it is a crime in New York State to possess a "firearm, rifle, or shotgun". The Supreme Court uses the phrase "sensitive place" to describe physical locations where the Government may "forbid[] the carrying of firearms". *D.C. v. Heller*, 554 U.S. 627 (2008); *Bruen*, 142 S. Ct. at 2118–19. I find that the terms "sensitive location" and "sensitive place" both mean locations where it is constitutionally permissible for the Government to regulate the carrying of firearms. *Bruen* at 2118. In this Opinion & Order, the terms "Sensitive Location" and "sensitive place" will be used interchangeably.

[3] The original text of N.Y. Penal Law § 265.01-e(2)(c) defined sensitive location as "any place of worship or religious observation." An amendment enacted on May 3, 2023, amended the text as applying to "any place of worship, except for those persons responsible for security at such place of worship." New York Laws 2023, ch. 55, Sec. F-1, eff. 5/3/2023. For clarity, I will refer to the original, unamended text of the Challenged Provision in the

e(2)(c).  The Sensitive Locations restriction exempts law enforcement officers, military

personnel, and armed security guards.  *Id.* §§ 265.01-e(2)(C) and (3).

On September 29, 2022, Plaintiffs initiated this action by filing a verified complaint.

(Doc. 1 "Compl.")  Goldstein "is a U.S. citizen who resides in Kings County in the State of New

York."  (Compl. ¶ 5.)  "Goldstein is the president of Congregation Bnei Matisyahu . . . a modern

orthodox Jewish congregation that is incorporated under the laws of the State of New York."

(*Id.* ¶ 6.)  Ornstein "is a U.S. citizen who resides in Rockland County in the State of New York."

(*Id.* ¶ 9.)  Plaintiffs, who are Jewish, claim to have carried handguns for self-defense at shul[4]

prior to the enactment of the CCIA.  (Ornstein Decl. ¶ 2, 5–8; Goldstein Decl. ¶ 2, 6–7)[5].  They

allege that after the enactment of the CCIA, they have (1) decreased their attendance at shul due

to their inability to carry a firearm, (Ornstein Decl. ¶ 13; Goldstein Decl. ¶ 21), and (2)

"significantly curtail[ed]" their religious practice, (Ornstein Decl. ¶ 19; *see* Goldstein Decl. ¶

21).  Plaintiffs further allege that the prohibition of concealed carry within places of worship and

religious observation "acts as a deterrent for law-abiding people to enter", and makes religious

locations more dangerous.  (Compl. ¶ 92–93.)  On the same day, Goldstein individually and on

behalf of the Congregation, and Ornstein filed a motion for TRO and PI enjoining Defendants

Governor Hochul, Attorney General James, Commissioner Sewell, Sheriff Falco, District

Attorney Gonzalez, and District Attorney Walsh from enforcing the Sensitive Locations

restriction, the provision in CCIA designating "any place of worship or religious observation" as

---

procedural history to reflect the language as it was when challenged by Plaintiffs, but I will analyze the merits of the
argument based upon the amended statute.

[4] "Shul" is Yiddish for synagogue.

[5] "Ornstein Decl." refers to the Declaration of Meir Ornstein submitted in support of Plaintiffs' Motion for a
Temporary Restraining Order and Preliminary Injunction.  (Doc. 6-4.)  "Goldstein Decl." refers to the Declaration of
Steven Goldstein in support of the same.  (Doc. 6-3.)

a Sensitive Location.  (Doc. 4.)  Plaintiffs claim that the Sensitive Locations restriction of the CCIA violates their rights under the First, Second, and Fourteenth Amendments.  Plaintiffs seek to enjoin Defendants from enforcing the places of worship and religious observation exclusion, alleging that they would suffer immediate and irreparable harm without immediate injunctive relief.

On October 3, 2022, I denied Plaintiffs' request for a TRO because they failed to demonstrate "immediate and irreparable injury sufficient to satisfy the stringent requirements for a temporary restraining order."  (Doc. 21 at 1–2.)  In the same order, I directed the parties to appear for a show cause hearing on October 28, 2022.  (*Id.* at 6.)  County Defendants, City Defendants, and State Defendants filed their response to the Order to Show Cause on October 14, 2022.  (Docs. 35, 37, and 38.)  On October 18, 2022, Everytown for Gun Safety filed a motion seeking leave to file an *amicus* brief.  (Doc. 41.)  I granted leave to file an *amicus* brief, (Doc. 44), and on October 20, 2022, *Amicus Curiae* Everytown for Gun Safety filed their brief.  (Doc. 46.)  On October 28, 2022, I held a show cause hearing, and heard arguments from the parties regarding the appropriateness of a preliminary injunction staying the enforcement of the Sensitive Locations restriction.

On May 3, 2023, an amendment to the CCIA's place of worship provision took effect.  New York Laws 2023, ch. 55, Sec. F-1, eff. 5/3/2023.  New York Penal Law § 265.01-e(2)(c) was amended to prohibit possession of a firearm, rifle, or shotgun in "any place of worship, except for those persons responsible for security at such place of worship."  New York Penal Law § 265.01-e(2)(c).

## II.    **Analysis**

Before proceeding to the merits of this dispute, I first consider the parties' argument on

whether the named Defendants are the proper Defendants for this suit, and whether Plaintiffs

have met their burden of establishing standing for their various challenges.

"The Constitution confers limited authority on each branch of the Federal Government."

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), as revised (May 24, 2016).  Article III, § 2

limits the subject-matter jurisdiction of the federal courts to "Cases" and "Controversies".  U.S.

CONST. art. III, § 2.  "No principle is more fundamental to the judiciary's proper role in our

system of government than the constitutional limitation of federal-court jurisdiction to actual

cases or controversies."  *Spokeo*, 578 U.S. at 337 (quoting *Raines v. Byrd*, 521 U.S. 811, 818

(1997)).  Standing is a "'jurisdictional' requirement and 'must be assessed before reaching the

merits'".  *Vitagliano v. Cnty. of Westchester*, No. 23-30, 2023 WL 4095164, at *4 (2d Cir. June

21, 2023) (quoting *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022)).

For there to be a case or controversy, under Article III, a plaintiff must have standing.

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  Because the question of standing is

a threshold issue that goes to the "constitutional limitations on the judicial Power of the United

States," courts are "entitled at any time *sua sponte* to delve into the issue" of standing even if

defendants do not raise the issue."  *Green Haven Prison Preparative Meeting of Religious Soc'y*

*of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021),

*cert. denied sub nom. Green Haven Preparative Meeting v. New York State Dep't of Corr. &*

*Cmty. Supervision*, 212 L. Ed. 2d 763, 142 S. Ct. 2676 (2022) (internal quotation marks omitted).

"At the preliminary injunction stage, a plaintiff's burden to demonstrate standing will normally

be no less than that required on a motion for summary judgment."  *Id.* (internal quotation marks

omitted).

With regard to proper-defendant status, the "Cases" or "Controversies" limitation of Article III of the Constitution requires that a federal court act only to redress injury that can be fairly traced back to the challenged action of the defendant. *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700, at *9 (N.D.N.Y. Nov. 7, 2022), *reconsideration denied sub nom. Antonyuk v. Nigrelli*, No. 122CV0986GTSCFH, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022).

### A. *Propriety of Each Individual Defendant*

### 1. **Applicable Law**

The Eleventh Amendment limits the jurisdiction of federal courts under Article III. *See Seminole Tribe of Fla. v. Fla*., 517 U.S. 44, 73 (1996) (discussing the "jurisdictional bar of the Eleventh Amendment"). "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. CONST. amend. XI. A narrow exception to Eleventh Amendment state immunity was enunciated in *Ex parte Young*: "[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Ex parte Young*, 209 U.S. 123, 155–56 (1908); *see also In re Dairy Mart Convenience Stores, Inc.,* 411 F.3d 367, 371 (2d Cir. 2005) ("*Ex parte Young* . . . held that sovereign immunity did not bar actions seeking only prospective injunctive relief against state officials to prevent a continuing violation of federal law because a state does not have the power to shield its

officials by granting them 'immunity from responsibility to the supreme authority of the United States.'" (quoting *Ex Parte Young*, 209 U.S. at 160)).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks omitted); *accord Dairy Mart*, 411 F.3d at 372. Further, "the exception under *Ex parte Young* only applies where the official sued has some connection with the enforcement of the allegedly unconstitutional act." *Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 67-68 (E.D.N.Y. 2018); *see also Chrysafis v. James*, 534 F. Supp. 3d 272, 288 (E.D.N.Y. 2021) (citing *Doe v. Holcomb*, 883 F.3d 971, 977 (7th Cir. 2018) (holding that the Eleventh Amendment barred the plaintiff's suit in federal court against the Attorney General of the State of New York because she had "not threatened to do anything, and cannot do anything, to prosecute a violation of" the challenged statute)); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("*Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." (internal quotation marks omitted)).

## 2.  Application

There are six named Defendants in this case. They are Governor Hochul, Attorney General James, Commissioner Sewell, Sheriff Falco, District Attorney Gonzalez, and District Attorney Walsh. As an initial matter, *Ex parte Young* applies. Plaintiffs' verified complaint satisfies the requirements in that the complaint (1) "alleges an ongoing violation of federal law" and (2) "seeks relief properly characterized as prospective." *Verizon Md., Inc.*, 535 U.S. at 645

(internal quotation marks omitted). The Plaintiffs allege that the enforcement of the Challenged Provision of the CCIA violates their First, Second, and Fourteenth Amendment rights. Their requested relief—that the named officials be enjoined from enforcing the Challenged Provision—would prospectively end the alleged violation. Based on this analysis, *Ex parte Young* applies.

District Attorney Gonzalez and District Attorney Walsh are proper defendants in this case. "Courts in this Circuit have held that district attorneys are proper defendants in suits challenging the constitutionally of state laws." *Sibley v. Watches*, 460 F. Supp. 3d 302, 322 (W.D.N.Y. 2020); *see, e.g.*, *Kelsey v. Kessel,* No. 22-CV-03774 (PMH), 2022 WL 3362456, at *2 (S.D.N.Y. Aug. 15, 2022) (finding that Plaintiff could arguably maintain a claim against an Assistant District Attorney to the extent that she was responsible for enforcing the State statutes Plaintiff challenged as unconstitutional.); *Nolan v. Cuomo*, No. 11 CV 5827 (DRH) (AKT), 2013 WL 168674, *11 n.7 (E.D.N.Y. Jan. 16, 2013) (concluding that the Suffolk County District Attorney was a proper party to plaintiff's official-capacity claims for injunctive relief against him in his official capacity and explaining that "[p]rosecutorial immunity does not extend to claims for prospective injunctive relief"); *Maloney v. Cuomo*, 470 F. Supp. 2d 205, 211 (E.D.N.Y. 2007) (dismissing claim challenging constitutionality of § 265.01(1) against the Attorney General and the Governor because "the district attorney alone" decided when and in what manner to prosecute a suspected offender (quoting *Baez v. Hennessy*, 853 F.2d 73, 76 (2d Cir.1988))), *abrogated by Maloney v. Cuomo* in light of *McDonald v. Chicago* on other grounds.[6] The District Attorneys have sufficient connection to the enforcement of the CCIA;

---

[6] I note that the District Attorneys do not raise the argument that they are not proper defendants. District Attorney Gonzalez is represented by the New York City Law Department, (Doc. 37), while Sheriff Falco and District Attorney Walsh are represented by the County Attorney for the County of Rockland, (Doc. 35). None of the parties contest the argument that they are proper Defendants in their papers.

therefore, I find that they are proper parties to Plaintiffs' claims for injunctive relief against them in their official capacity.

Plaintiffs allege that Commissioner Sewell is a proper defendant because she is "ultimately responsible for enforcing the penal laws of the State of New York within [New York City.]" (Compl. ¶15.) Similarly, Sheriff Falco is allegedly a proper defendant because he is responsible for enforcing the penal laws of the State of New York in Rockland County. (Compl. ¶17.) Plaintiffs fear prosecution based on their desire to carry firearms inside houses of worship in Rockland County and Brooklyn, New York, where Sheriff Falco and Commissioner Sewell have the authority to arrest them.[7] (Compl. ¶¶ 53, 64.) Thus, I also find that Commissioner Sewell and Sheriff Falco are proper defendants for Plaintiffs' claims for injunctive relief against them in their official capacity.

However, I find that Governor Hochul and Attorney General James are not proper defendants in this case. Although Plaintiffs allege that the Challenged Provision deprives them of their First, Second, and Fourteenth Amendment rights, and seek prospective injunctive relief to prevent a continuing violation of federal law, they do not allege that Attorney General James or Governor Hochul are themselves committing any ongoing violations of federal law, *i.e*, that the Attorney General or the Governor is enforcing or threatening to personally enforce the allegedly unconstitutional statute.

Plaintiffs merely state that Governor Hochul is "responsible for the execution and administration of the laws of the State of New York and is responsible for the implementation and enforcement of the policies of the executive branch of the State of New York." (Compl. ¶ 10.) The Governor's general duty to execute the laws is not sufficient to make her a proper

---

[7] Defendants do not dispute these allegations or raise arguments to the contrary.

party in a suit challenging a state statute. *See Citizens Union of City of New York v. Att'y Gen. of New York*, No. 16CIV9592RMBKHP, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017) (dismissing Governor as a defendant where he only had a "general duty to 'take care that the laws are faithfully executed'" (quoting N.Y. CONST. art. IV, § 3)).

Similarly, the Attorney General's general duty to enforce the laws is not sufficient to make her a proper party in a suit challenging a state statute. Plaintiffs allege that Attorney General James is a proper defendant because she "is responsible for the enforcement of laws and prosecution of crimes throughout the State." (Compl. ¶ 11.) Although the Attorney General "is charged with defending the constitutionality of state law, this fact alone does not provide a basis for bringing an action against" the Attorney General. *Ulrich v. Mane*, 383 F. Supp. 2d 405, 410 (E.D.N.Y. 2005). Plaintiffs have not shown that either Governor Hochul or Attorney General James have the specific legal duty to enforce the CCIA, that they have enforced the CCIA, or that they intend to enforce the CCIA against the Plaintiffs. *See HealthNow New York Inc. v. New York,* 448 F. App'x 79, 81 (2d Cir. 2011) (affirming the judgment of the district court that the Attorney General was not a proper defendant because "there is nothing to indicate the Attorney General has used or is about to use section 63(12) to investigate HealthNow's practices in connection with the Anti–Subrogation Law."); *see also Antonyuk*, 2022 WL 16744700, at *40 (dismissing Governor Hochul as a party because "it is not clear to the Court how, to the extent that Plaintiffs were to ultimately prevail on their claims, Defendant Hochul would be the individual who may provide them the (legal) relief they seek."). As neither the Governor nor the Attorney General have sufficient connection with the enforcement of the Challenged Provision, they cannot be a party to this suit. *Ex Parte Young*, 209 U.S. at 157; *see also Mendez v. Heller,* 530 F.2d 457, 460 (2d Cir. 1976).

Finally, the Governor and Attorney General are not proper defendants because Plaintiffs fail to argue that the alleged constitutional violations caused by the enforcement of the Challenged Provision could be remedied by granting the preliminary injunction against the Governor and the Attorney General. *See Chrysafis v. James,* 534 F. Supp. 3d 272, 287 (E.D.N.Y. 2021) (finding that *Ex parte Young* exception to Eleventh Amendment immunity did not apply to Attorney General where Attorney General was not enforcing or threatening to enforce the allegedly unconstitutional statute thereby injuring plaintiffs, and therefore could not be remedied by granting prospective injunctive relief against the Attorney General); *see also Mendez v. Heller,* 530 F.2d 457, 460 (2d Cir. 1976) (finding that because the Attorney General had no connection with the enforcement of the challenged state statute that he could not be a party to the suit). For these reasons, I dismiss Defendants Governor Hochul and Attorney General James as parties to this action.

### B. *Standing*

#### 1. Applicable Law

"A plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted). "To establish Article III standing, a Plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58). The injury-in-fact prong is met in the context of pre-enforcement challenges where a plaintiff demonstrates: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the intended conduct is "proscribed by" the challenged law; and

(3) that "there exists a credible threat of prosecution thereunder." *Vitagliano v. Cnty. of Westchester*, No. 23-30, 2023 WL 4095164, at *5 (2d Cir. June 21, 2023).

The standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the judiciary] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819–20. Establishing standing is an "indispensable part of the plaintiff's case", and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof". *Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Pre-enforcement challenges to criminal statutes are "cognizable under Article III." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). A plaintiff does not have to be actually arrested or prosecuted to be entitled to challenge a statute that he claims "deters the exercise of his constitutional rights"; instead a plaintiff satisfies the injury in fact requirement when they allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159 (internal quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Vitagliano v. Cnty. of Westchester*, No. 23-30, 2023 WL 4095164, at *5 (2d Cir. June 21, 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). A credible threat of prosecution cannot rest on fears that are "imaginary or wholly speculative." *Id.* (quoting *Cayuga Nation*, 824 F.3d at 331).

"The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the circumstances at issue, and will not be found where

plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Cayuga Nation*, 824 F.3d at 331 (internal quotation marks omitted). "The credible-threat standard 'sets a low threshold . . . [and] courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Vitagliano,* 2023 WL 4095164, at *6 (quoting *Cayuga Nation*, 824 F.3d at 331*)*.

### 2. Application

Plaintiffs have adequately alleged that they suffered an injury in fact, that their alleged injury was caused by the Challenged Provision, and that their injury is redressable by a ruling in their favor. Therefore, Plaintiffs have standing to bring this pre-enforcement challenge to the Challenged Provision.

Plaintiffs have adequately alleged that they suffered an injury in fact. First, Plaintiffs have sufficiently demonstrated "an intention to engage in a course of conduct arguably affected with a constitutional interest". *Susan B. Anthony List,* 573 U.S. at 159. Although Plaintiffs have not explicitly stated that they carried a firearm into shul since the passage of the Challenged Provision, nor admit that they had concrete plans to do so in the future, they do not need to do so to allege "an intention to engage in a course of conduct". *Picard*, 42 F.4th at 97. Such an intention "does not necessarily require a specification of the date and time she plans to do something of constitutional significance." *Vitagliano,* 2023 WL 4095164, at *5. In their papers, Plaintiffs have included descriptions of why they wish to carry firearms into shul, their history of carrying firearms into shul, and copies of their firearm licenses. (Doc. 59 ¶¶ 1, 4; Doc. 60 ¶¶ 1, 4.) This is sufficient to establish Plaintiffs' intention to carry a firearm into shul "but for" the enactment of the CCIA. *Vitagliano,* 2023 WL 4095164, at *6 (finding that Plaintiff had

established an intention to engage in a course of conduct arguably affected with a constitutional interest where the plaintiff had described the origins of her desire to become a sidewalk counselor, the steps she took to train and prepare, and the approach she planned to take as a sidewalk counselor); *see also, e.g., Silva v. Farrish*, 47 F.4th 78, 87 (2d Cir. 2022).

Plaintiffs' intended course of conduct is clearly "affected with a constitutional interest." *Susan B. Anthony List,* 573 U.S. at 159. Plaintiffs allege that they desire to carry concealed firearms into places of worship. Goldstein alleges that he "desires to carry a handgun at Bnei Matisyahu for self-defense and the defense of his family and his congregation", (Compl. ¶ 53), and Ornstein alleges that he "wishes to carry a concealed handgun for his own protection." (*Id.* ¶ 64). The Plaintiffs' desired conduct is clearly affected with a Second Amendment interest. This case concerns the ability for an individual to carry guns in places of worship, and the Second and Fourteenth Amendments "protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. Further, the question of where and when the Government is permitted to regulate or prohibit firearms under the Second Amendment is obviously affected with a constitutional interest. Because Plaintiffs' intended course of conduct involves the carrying of firearms by private individuals outside of the home and raises questions regarding the scope of the Second Amendment, they have satisfied the first prong of the pre-enforcement injury-in-fact test.

Second, Plaintiffs' intended conduct is proscribed by the challenged law. A plaintiffs' allegations that "make it clear that [their] desired course of conduct is proscribed by the Act" is sufficient to meet this prong of the standing analysis. *Vitagliano,* 2023 WL 4095164, at *5. Here, Plaintiffs' allegations satisfy the applicable standard. The Challenged Provision makes it a criminal offense to "possess a firearm, rifle or shotgun" in "any place of worship," N.Y. Penal

Law § 265.01-e(1), (2)(c), which is exactly what Plaintiffs want to do, (Compl. ¶¶ 53, 64).

Plaintiffs' allegations regarding their intended conduct is proscribed by the challenged law, and

thus clearly show "a sufficient causal connection between the injury and the conduct complained

of" thereby satisfying the second prong of this test.  *Id.*  (quoting *Driehaus*, 573 U.S. at 158).

Third, Plaintiffs have demonstrated that they face a credible threat of enforcement if they

follow through with their intention to carry handguns into shul.  While neither Plaintiff has stated

an intention to carry a handgun into shul in contravention of the CCIA, they are not required to

do so in order for me to find standing.  A plaintiff suffers an injury-in-fact sufficient to establish

standing when he or she faces threatened enforcement of a law that is "sufficiently imminent",

*Driehaus,* 573 U.S. at 159, and actual arrest or prosecution is not required.  *Id.* at 158.  It is well-

established that "[w]here a statute specifically proscribes conduct, the law of standing does not

place the burden on the plaintiff to show an intent by the government to enforce the law against

it." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) (internal quotation

marks omitted).  Rather, intent by the government to enforce the law is presumed "in the absence

of a disavowal by the government or another reason to conclude that no such intent existed." *Id.*

(internal quotation marks omitted).

Here, New York State enacted the CCIA on July 1, 2022, and amended the Challenged

Provision on May 3, 2023.  The Plaintiffs filed their verified complaint on September 29, 2022,

just three months after the enactment of the statute, and Plaintiffs' intended course of conduct

falls squarely within the Act's prohibitions.  There is no indication that the State has disavowed

enforcement of the CCIA or the Challenged Provision, and the City, County, and State

Defendants make no argument suggesting that officials would not enforce the law.  Indeed, the

fact that the Challenged Provision was recently amended suggests that the statue is relevant and

not moribund.  *See Cayuga Nation,* 824 F.3d at 331.  As I have no reason to doubt that the Government will enforce its recently enacted law, I may presume that Plaintiffs face a credible threat of enforcement if they pursue their intention to carry a handgun into shul.

Finally, Plaintiffs have satisfied the causation and redressability requirements because their alleged injury is traceable to the Challenged Provision, and can be redressed by their requested injunctive relief.  As Plaintiffs have adequately alleged facts to show an injury-in-fact, causation, and redressability, I find that they have sufficiently established Article III standing to raise a pre-enforcement challenge.

### C.  *Preliminary Injunction*

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24, 129 (2008).  A party seeking a preliminary injunction must establish "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest."  *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011).  However,

> [w]here the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.

*Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995).  This heightened requirement reflects the notion that statutes and policies implemented through the legislative process are entitled to a "higher degree of deference and should not be enjoined lightly."  *Id.*

Issuance of preliminary injunctive relief "is an extraordinary and drastic remedy, one that

should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005). The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*). Lastly, "the district court has wide discretion in determining whether to grant a preliminary injunction, and [the Second Circuit] reviews the district court's determination only for abuse of discretion." *Moore*, 409 F.3d at 511 (2d Cir. 2005).

Here, Plaintiffs move to stay the Challenged Provision, a part of the CCIA enacted by the New York State Legislature and signed by Governor Hochul for the stated purposes of public safety and gun regulation, and in an effort to align state law with *Bruen*. A preliminary injunction enjoining Defendants from enforcing the law will clearly "affect government action taken in the public interest"; therefore, Plaintiffs must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction to succeed on their motion.

### 1. Irreparable Harm

A showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction", *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted), and is essential for a plaintiff to show in order to obtain preliminary injunctive relief, *see Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). Irreparable harm exists where, absent an injunction, a movant will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id*. A plaintiff suffers irreparable harm when his or her injury cannot be adequately compensated by a monetary award.

*See Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113–14 (2d Cir. 2003).

If I determine that Plaintiffs are likely to prevail on their allegations involving deprivation of constitutional rights, this raises a "presumption of irreparable harm" and no further showing of irreparable injury is necessary. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020), *citing Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir. 1996) ("a presumption of irreparable injury . . . flows from a violation of constitutional rights"). Where plaintiffs allege "deprivation of a constitutional right, no separate showing of irreparable harm is necessary." *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999). However, a mere "assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm." *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012). As Plaintiffs allege violations of their constitutional rights as the irreparable injury suffered, they must show a likelihood of success on the merits of their constitutional claims to meet the irreparable injury prong to merit a preliminary injunction. *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000.)

Therefore, to resolve whether Plaintiffs have adequately pled irreparable harm, I turn to whether Plaintiffs are likely to succeed on the merits of their First, Second, and Fourteenth Amendment claims.

## 2. Likelihood of Success on the Merits

In their motion for preliminary injunction, Plaintiffs raise four claims. They allege that enforcement of the Challenged Provision would violate their rights under: (1) the Second Amendment; (2) the First Amendment Free Exercise Clause; (3) the Fourteenth Amendment proscription against vague laws; and (4) the Fourteenth Amendment's Equal Protection Clause. I address each in turn and find that Plaintiffs are unlikely to succeed on the merits of their claim.

### a. Second Amendment Claim

Plaintiffs' central argument is that the Challenged Provision violates their Second Amendment right to bear arms—specifically, the right established by *Bruen* for law-abiding citizen to "carry a handgun for self-defense outside the home." *Bruen,* 142 S. Ct. at 2122. They also allege that the state has not met its burden of showing that the CCIA is "consistent with this Nation's historical tradition of firearm regulation", and that they have failed to prove that places of worship are sensitive places where the Government may constitutionally restrict firearm carry. *Id.* at 2126. They argue that there is no historical support or analogy for the restriction of firearms in places of worship and that Defendants have not met their burden because they have proffered insufficient statutes or cases as historical support or in analogy. Further, Plaintiffs argue that I should disregard the historical statutes and cases Defendants cite, because they are not from the founding era. Lastly, Plaintiffs argue that "no laws, cases, statutes or ordinances existed close to 1791 that simply banned firearms in churches or other places of worship." (Doc. 49 at 5.) Plaintiffs' claim that in order for Defendants to establish that houses of worship are sensitive places under *Bruen* they must show that: (1) there existed firearm regulations that restricted open carry of firearms inside "churches" or places of religious worship; (2) such law regulated firearms in churches in a way that is entirely unrelated to them being places where

people congregate, (3) that the statutes of regulations are from the founding era,[8] and (4) that such statutes or regulations be only from Union States and not Confederate States. (*Id.* at 4–8.) This interpretation has little support from *Bruen* or *Heller*.

Blanket prohibitions on the carrying of handguns for self-defense by law-abiding individuals inside the home and in public are unconstitutional. *See Bruen,* 142 S. Ct. at 2122; *Heller,* 554 U.S. at 635. However, the Second Amendment does not completely preclude the state from establishing restrictions and regulations on who, how, and where firearms can be possessed and carried. *See Heller,* 554 U.S. at 636; *Bruen,* 142 S. Ct. at 2133, *see also Bruen,* 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

"Like most rights, the right secured by the Second Amendment is not unlimited." *Heller,* 554 U.S. at 626. There is a long tradition of courts explaining that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" *Id.* at 627; *see also McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 786 (2010) (reaffirming this statement). In *Heller*, the Court noted that "the majority of the 19th century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626. The Court further noted that while it found the District of Columbia's ban on handgun possession in the home unconstitutional, "[t]he Constitution leaves the District of Columbia a variety of tools for combating" the problem of handgun violence. *Id.* at 636.

The Challenged Provision differs from N. Y. Penal Law § 400.00(2)(f), the New York State statute struck down in *Bruen*, because it does not broadly prevent law-abiding citizens with

---

[8] The Court in *Bruen* left open the question of whether lower courts should primarily rely on the "prevailing understanding of an individual right" in 1791 or 1868. *Bruen,* 142 S. Ct. at 2138. In line with *Bruen,* I consider historical evidence presented by Defendants from a range of dates, giving more weight to evidence from around both of these time periods.

ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms in public for self-defense. *Bruen,* 142 S. Ct. at 2138. Instead of requiring ordinary citizens to show a special need for self-protection beyond those of the general public, the CCIA, among other things, designates places of worship as a Sensitive Location, a regulatory scheme that the Court has stated can be constitutionally permissible if lower courts find that there are historical analogues that are "analogous enough" to permit the statute in question to pass constitutional muster. *Id.* at 2118.

Laws forbidding "the carrying of firearms in sensitive places such as schools and government buildings" are consistent with the Second Amendment. *Id.* at 2133. Lower courts may "use analogies" to historical regulations of sensitive places, such as schools, government buildings, legislative assemblies, polling places, and courthouses, to "determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."[9] *Id.* (emphasis in original.) Although the Court does not explicitly define what constitutes a sensitive place, it does address specific examples that provide lower courts with some guidelines on the limits of doctrine. For example, we know that it would be "too broad[]" to classify the entire island of Manhattan simply because it is "crowded and protected generally by the New York City Police Department." *Id.* at 2118. However, it is also not so narrow that the Government must find an identical law from the relevant historical periods for the modern-day regulation to be allowed. *Id*. at 2134 (noting that "analogical reasoning

---

[9] When the Court blessed "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" in *Heller*, it explicitly noted it "identif[ied] these presumptively lawful regulatory measures only as examples; [the] list does not purport to be exhaustive." *Heller*, 554 U.S. at 627, n. 26.

requires only that the government identify a well-established and representative historical analogue, not a historical twin.")

The Court has left open the question of whether historical evidence from the adoption of the Second Amendment in 1791 or the adoption of the Fourteenth Amendment in 1868 is more instructive when evaluating a statute in relation to this Nation's historical tradition. *Id.* at 2138. "Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. *Id.* at 2136. This suggests that evidence from around both time periods are instructive regarding the scope of the right. Further, gun regulations from the late 19th century can be considered, as long as they are not contradicted by earlier evidence. Although the Court dismissed the state's argument in *Bruen* that there was a slight uptick in gun regulations during the late 19th century, it did so on the grounds that late 19th century evidence could not provide "much insight into the meaning of the Second Amendment when it contradict[ed] earlier evidence", *id.* at 2154, and that the majority of the statutes cited were from the Western Territories,[10] *id.* at 2121. Indeed, the Court in *Bruen* considered evidence from both the founding era (the years around 1791) and reconstruction era (the years around 1868), and determined that reconstruction era regulations were "consistent with a right of the public to peaceably carry handguns for self-defense."[11] *Id.* at 2152.

---

[10] *Bruen* rejected evidence showing that there was a slight uptick in gun regulation during the late 19th century, pointing to the fact that most of the statutes the State cited were from the sparsely populated Western Territories. It must be noted that the primary reason the Court rejected these statutes as sufficient was because it found that they contradicted the Nation's earlier and more widespread acceptance of carrying firearms for normal self-defense, not because of the value of historical evidence from the late 19th century to Second Amendment analysis. *See Bruen* 142 S. Ct. at 2154.

[11] *Bruen* acknowledges there is an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." 142 S. Ct. at 2138. However, the Court did not address the issue of which time period was the appropriate historical period to consider for *Bruen* analysis as "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* Accordingly, I reference examples from around both time periods.

Therefore, after discussing the law behind the concept of a sensitive place, I will then look to both time periods for historical evidence.

With regard to the application of sensitive places jurisprudence to this case, I first outline the history of the doctrine and guidance the Supreme Court provides concerning how to properly draw historical analogies from founding and incorporation era laws.  In *Heller*, the Supreme Court introduced the concept of sensitive places where the government can constitutionally restrict the carrying of firearms.  David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Location Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 203, 207 (2018).  Specifically, the Court stated that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ".  *Heller*, 554 U.S. at 626.  The Supreme Court reaffirmed this point in *McDonald*, stating "[w]e repeat those assurances here."  *McDonald*, 561 U.S. at 786.  In *Bruen,* the Court expanded on the sensitive places analysis and instructed district courts to use analogical reasoning to historical regulations to determine whether the regulated areas are "sensitive places where arms carrying [can] be prohibited consistent with the Second Amendment."  142 S. Ct. at 2133.  Significantly, the Court also noted that analogies to historical regulations of sensitive places can be used to prohibit "the carry[ing] of firearms in *new* and analogous sensitive places".  *Id.* (emphasis in original).

"Legislative assemblies, polling places, and courthouses" are "settled" sensitive places "where arms carrying could be prohibited consistent with the Second Amendment" because they were place where "weapons were altogether prohibited in the 18th and 19th centuries."  *Id.*; *see also Heller*, 554 U.S. at 626.  The Court reached this conclusion even though it found that "the

historical record yields relatively few 18th and 19th century 'sensitive places' where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses" because they were "also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* Further, the Court held in *Heller* that schools[12] and government buildings are also "sensitive places" where the carrying of firearms could be prohibited consistent with the Second Amendment.[13] *Heller*, 554 U.S. at 626. I note that from the colonial period to the founding era, few states had laws restricting firearms from legislative assemblies, polling places, and courthouses — Delaware's 1776 Constitution included an article to prevent bringing arms to polling places, and Maryland had statutes from 1647 and 1650 forbidding arms carrying in either house of the legislature. Kopel & Greenlee, *supra*, at 235. Indeed, throughout the mid-nineteenth century, U.S. Congresspeople were regularly armed when they attended Congress. Joanne B. Freeman, *When Congress was Armed and Dangerous*, N. Y. Times, Jan 11, 2011, https://www.nytimes.com/2011/01/12/opinion/12freeman.html. Indeed, even today there is an exception to the law banning civilians from carrying guns on Capitol Hill for lawmakers, who may keep firearms in their offices.[14] 40 U.S.C. § 193a *et seq.*

I now apply the Court's instruction in *Bruen* that lower courts use analogies to the historical regulations of sensitive places to determine that modern regulations prohibiting the

---

[12] A review of the article cited by the Court found that the historical evidence supporting the finding that schools were a sensitive place was limited to: (1) an arms ban at the University of Virginia in 1824, (2) outlawing of certain "places of amusement within three miles of campus" at the College of New Jersey in 1853, and (3) a Mississippi law barring students from carrying concealed weapons at any university college, or school in 1878. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 251 (2018).

[13] *See, supra* at 12 for the limited historical record of firearm regulation on school grounds.

[14] 40 U.S.C. § 193a *et seq.* contains an exception for those "authorized by regulations which shall be promulgated by the Capitol Police Board." The Capitol Police Board regulations (Appendix J) states that "nothing contained in [40 U.S.C. § 193a *et seq.*] shall prohibit any Member of Congress from maintaining firearms within the confines of his office or any Member of Congress or any employee or agent of any Member of Congress from transporting within the Capitol Grounds firearms unloaded and securely wrapped."

carrying of firearms in new and analogous sensitive places—here, houses of worship—are
constitutionally permissible.[15]

There is a sufficient historical record to support the finding that houses of worship are
sensitive places, where it is constitutionally permissible for the state to regulate the carrying of
firearms. *Bruen,* 142 S. Ct. at 2133. There are both laws that specifically outlaw the carrying of
weapons in churches or places of worship, and broader founding era regulations that limit the
ability for law-abiding individuals to carry weapons in public generally, which would include
inside places of worship.

Both the State and City Defendants provide historical statutes and laws from a variety of
states that support the finding that there is a robust tradition of considering houses of worship as
Sensitive Locations. (Docs. 37, 38.) A non-exhaustive selection of these laws include: (1) an

---

[15] Some courts, legal scholars, and historians have questioned the logic of limiting Second Amendment analysis
such that it focuses "nearly exclusively on history." *Bruen*, 142 S. Ct. at 2164 (Breyer J., dissenting). I note but do
not address in detail the weaknesses inherent in reliance on history to circumscribe the scope of the Second
Amendment, such as the fact that judges are not historians, the dangerous potential for historical examples to be
cherry-picked and the historical record to be distorted to bolster a particular viewpoint, and the practical difficulty of
resolving complex historical questions, especially when a written historical record is anecdotal, incomplete or
inaccessible. I am concerned about relying solely on looking to historical statutes and regulations from 1791 and
1868 to determine the breadth of the Second Amendment.

I also note that in the founding era, "the standard weapon for the infantry . . . was a smoothbore musket," a "crude
weapon [that] often failed to fire." John S. Pancake, 1777: The Year of The Hangman 72–73 (1977). This weapon
"had a maximum effective range of seventy-five yards and took from twenty to thirty seconds to reload. On the
battlefield a fire delivered [by a unit] at pointblank range (twenty-five to thirty yards) rarely inflicted more than ten
percent casualties." *Id.* at 71. By way of contrast, the widely used handgun – a standard Glock 19 – has a standard
15 magazine capacity, and has an effective range of 50 yards (meaning that an average skilled shooter hit a target
from 50 yards 50% of the time). How Far Can a Glock 19 Shoot?, SHARPSHOOTER SOCIETY, *How Far Can a Glock
19 Shoot? Bullet Distance Measurements* (sharpshootersociety.com). There were also restrictions on firearms
access and ownership by Black people and Native Americans unrelated to whether they were law-abiding. *See
generally* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. 537 (2023). The
implications of firearm ownership in both the founding and reconstruction eras was thus dramatically different from
those in 2023, and thus, answering the question of whether statutes and regulations from those respective time
periods are "relevantly similar under the Second Amendment", *Bruen*, 142 S. Ct. at 2132, is an enormously difficult
task that is likely to lead to inconsistent decisions that are untethered to reality, and is considered by many to be an
impractical and intellectually flawed approach. Despite my misgivings, I must apply the law as stated by the
Supreme Court and do so here.

1870 Texas law providing that "if any person shall go into any church or religious assembly . . . and shall have about his person . . . fire-arms, whether known as a six-shooter, gun, or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor," (Doc. 39-9 at 3); (2) an 1870 Georgia law providing that "no person in said State of Georgia be permitted or allowed to carry about his or her person any . . . pistol or revolver, or any kind of deadly weapon, to any . . . place of public worship," (Doc. 39-8 at 3); (3) an 1883 Missouri law mandating fines or imprisonment "[i]f any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship," (Doc. 39-10 at 3); (4) an 1877 Virginia law proscribing "carrying any gun, pistol, . . . or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place," (Doc. 39-11 at 7); (5) an 1883 Wisconsin Law stating that "[a]ny person who shall be found in or upon any street, alley or public ground within said city, or within any saloon, shop, store, grocery, hall, church, school house, barn, building or other place within said city . . . shall use toward or in the presence of another, violent or insulting language or be guilty of any breach of the peace, or firing of any gun or pistol, or fighting or threatening to fight, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by fine not exceeding twenty-five ($25) dollars and costs of prosecution, or imprisonment in the county jail not more than ninety days, or both, in the discretion of the court," (Doc. 37 at 16 n. 13 (citing 1883 Wis. Sess. Laws 841 vol.2 (emphasis added)); and (6) an 1889 Arizona law stating, "If any person go into any church or religious assembly . . . and shall have or carry about his person a pistol or other firearm . . . he shall be punished . . . and shall forfeit to the County the weapon or weapons so found on his person," (Doc. 39-12 at 4). Defendants cite a multitude of other similar laws from both former Confederate and Union states in their papers. (*See* Doc. 37

28

at 15–18; Doc. 38 at 11–14.)  This review of the historical record indicates that there is a longstanding historical tradition of regulating firearm carriage in houses of worship comparable to that of settled sensitive places like schools and government buildings.  Indeed, the number of historical legislative references that support a finding that a house of worship is a sensitive place far surpasses the number of references cited in *Bruen* and *Heller* as support for finding schools and government buildings as sensitive places.

Beyond the historical record of laws restricting the carrying of firearms in places of worship, there is also historical precedent for the restriction of firearm-carry for law-abiding citizens either in specific physical locations or for public safety reasons.  With regard to general restrictions, for example, in 1686 New Jersey passed a law that banned "[p]ersons [from] wearing Swords, Daggers, Pistols, Dirks, Stilladoes, Skeines, or any other unusual and unlawful Weapons in public because it induced great Fear and Quarrels."  An Act Against Wearing Swords, &c., in The Grants, Concessions, and Original Constitutions of the Province of New-Jersey 289 (1758).  Louisiana in 1813, fined any person found with a concealed weapon "such as a dirk, dagger, knife, pistol, or other deadly weapon."  Acts Passed at the Second Session of the First Legislature of the State of Louisiana 172-75 (1813).

At least 11 other states had similar laws on the books between 1791 and 1868 restricting the carrying of pistols or "offensive and dangerous" weapons generally.  *See* Mark Frassetto, Firearms and Weapons Legislation up to the Early 20th Century 20–24 (2013), available at http://ssrn.com/abstract=2200991.  Although several of these laws were challenged and the general restriction of firearm carry or keeping was found unconstitutional in later cases, the

subsequent decisions (except Kentucky)[16] all explicitly found that the regulation of firearms was permissible and constitutional.

Indeed, *Andrews v. State,* cited in *Bruen* for the premise that earlier state courts recognized that "any categorical prohibition on [] carry[ing concealed weapons] would "violat[e] the constitutional right to keep arms", *Bruen*, 142 S. Ct. at 2147 (citing *Andrews v. State*, 50 Tenn. 165, 182 (Tenn. 1871)) (third alteration in original), indicates that these earlier courts countenanced location-based firearm restrictions. *Andrews* notes that "a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them, nor necessary in order to his familiarity with them, and his training and efficiency in their use." 50 Tenn. at 182.

Similarly, *State v. Smith,* emphasizes the State's right to regulate firearm carrying so far as it was necessary "to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defense." 11 La. 633, 633 (La. 1856). In *Nunn v. State,* cited in *Bruen* to demonstrate that Georgia's general prohibition was unconstitutional, 142 S. Ct. at 2147 (citing *Nunn v. State*, 1 Ga. 243 (Ga. 1846))), the Supreme Court of Georgia noted that

> a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

---

[16] *Bruen*, 142 S. Ct. at 2147, cites *Bliss v. Commonwealth,* 12 Ky. 90, 90-93 (Ky. 1822) with approval, noting that it invalidated Kentucky's concealed-carry prohibition on the basis that it violated an analogue to the Second Amendment in the state constitution. The dissent in *Bruen* retorts that "*Bliss* was later overturned by constitutional amendment and was, as the Court appears to concede, an outlier." 142 S. Ct. at 2187 (Breyer, J., dissenting).

*Nunn*, 1 Ga. at 249.  Indeed, four of the five state supreme court cases cited in *Bruen* for the

principle that "history reveals a consensus that States could not ban public carry altogether"

suggests that, while blanket bans on carrying weapons might be impermissible, state courts

regularly approved of broad carrying regulations such as prohibitions on the concealed carrying

of firearms.  142 S. Ct. at 2146–47.[17]

There are also various examples from state courts from the founding era that enforced

laws restricting firearm carry in public places by law-abiding citizens and rejected Second

Amendment challenges to various provisions.  For example, the Supreme Court of Texas found it

"little short of ridiculous" to claim a right to carry "into a peaceable public assembly, as, for

instance, into a church, a lecture room, a ball room, or any other place where ladies and

gentlemen are congregated together." *English v. State*, 35 Tex. 473, 478–79 (Tex. 1871); the

Georgia Supreme Court stated that "carrying arms at courts, elections and places of worship, etc.,

is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of

evil, that it would be strange if the framers of the constitution have used words broad enough to

give it a constitutional guarantee." *Hill v. State*, 53 Ga. 472, 475 (Ga. 1874).  *See also Wilson v.

State*, 33 Ark. 557, 560 (Ark. 1878) ("No doubt in time of peace, persons might be prohibited

from wearing war arms to places of public worship, or elections, etc.").  This historical record of

laws and cases with specific location-based and general firearm restrictions suggest that

legislatures and courts from the founding and reconstruction eras were involved in firearms

---

[17] *State v. Reid*, 1 Ala. 612, 617 (Ala. 1840) ("[D]oes the act, "To suppress the evil practice of carrying weapons secretly," trench upon the constitutional rights of the citizen.  We think not."); *State v. Chandler*, 5 La. Ann. 489, 489–90 (La. 1850) (approving of a prohibition on the concealed carry of deadly weapons, including pistols as "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons"); *Andrews*, 50 Tenn. at 182; *Nunn*, 1 Ga. At 249 (Ga. 1846).  *Bliss,* 12 Ky. 90, alone takes the absolutist position on firearm regulation and, as noted appears to be an outlier in this regard, *supra* n.17.

regulation, and considered firearm carriage restrictions to be appropriate in certain contexts and physical locations.

I now turn to laws cited by Plaintiffs where individuals were "required by law to bring a firearm to church." (Doc. 49 at 5.) Plaintiffs cite a 1770 Georgia statute to this effect. (Doc. 50-4). However, these requirements were not rooted in the Second Amendment's tradition. Rather, these laws required militiamen or free white men to bring their firearms to church and were passed so they could defend against potential attacks by Native Americans and Blacks during slave uprisings. Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Right*s, 80 L. & Contemp. Probs. 55, 75 (2017); Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. on Firearms & Pub Pol'y 1, 14 (2004). In other words, these statutes are rooted in racism not the Second Amendment.[18] Indeed, the rationale and basis for these statutes are clear from the words of the statutes. For example, the Connecticut statute requiring that militiamen bring guns to church states: "To prevent or withstand such sudden assaults as may be made by Indeans upon the Sabboth or lecture days, It is Ordered, that one person in each several howse wherein any souldear or souldears, shall bring a musket . . . to each meeting." Cramer, *supra* at 12.[19] A Virginia statute from 1738 required "all militiamen to come to church armed, if requested by the county's militia commander."[20] Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty Univ. L. Rev. 653, 698 (2014).[21]

---

[18] These statutes demonstrate the pitfalls of relying on historical statutes to determine the contours of the Second Amendment. The motivation for the passage of these laws was untethered to the Second Amendment.

[19] This article reproduces the text of the relevant statue.

[20] In 1665, the Virginia House of Burgesses worried that the "careless Manner" of people going unarmed to "Churches, Courts, and other public Meetings, may probably, in time, incite the Indians, to make some desperate Attempt upon them", and accordingly requested that the governor tell militia officers to "take care and prevent the same." Nicholas J. Johnson *et al*., Firearms Law and the Second Amendment: Regulation, Rights, and Policy ch. 3.B.1.b.i (3d ed. 2021).

[21] This article reproduces the text of the relevant statue.

Similarly, in 1738, South Carolina broadened the authority of its militia commanders so that they "could order all men to go to church armed with weapons, and appoint patrols to visit all negro quarters, and other places suspected of entertaining unlawful assemblies of slaves, servants, or other disorderly persons." SALLY E. HADDEN, SLAVE PATROLS: LAW AND VIOLENCE IN VIRGINIA AND THE CAROLINAS 31 (2003) (internal quotation marks omitted). The laws cited by Plaintiffs concerning the mandatory carry of firearms in places of worship are rooted in racial supremacy, and had the reprehensible and shameful goal of preserving slavery. They should not be considered or at a minimum deserve little or no weight in the analysis of the history and tradition of the regulation of firearm carry by law-abiding citizens for self-defense. However, the fact that these regulations existed suggests that legislatures have long exercised significant regulatory power over firearm carry, and individuals' ability to carry firearms in houses of worship.

### b. First Amendment – Free Exercise Clause

The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. "Only beliefs rooted in religion are protected by the Free Exercise Clause." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,* 450 U.S. 707, 713 (1981). Plaintiffs must also demonstrate that the challenged regulation burdens their exercise of religion. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). However, an individual's religious beliefs do not excuse them from "compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 878–79 (1990); *see also Minersville School Dist. Bd. of Ed. v. Gobitis,* 310 U.S. 586, 594–95 (1940) ("The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the

citizen from the discharge of political responsibilities.")  Laws that incidentally burden religion are "not subject to strict scrutiny under the Free Exercise Clause as long as they are neutral and generally applicable." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021).  A government fails to act neutrally if it proceeds "in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. A plaintiff bears the preliminary burden to demonstrate an infringement of his rights under the Free Exercise Clause. *Bremerton Sch. Dist.*, 142 S. Ct. at 2421.  If the plaintiff carries the burden, the burden shifts to the defendant to demonstrate that its actions were justified and sufficiently tailored. *Id.*  Therefore, I must first determine whether Plaintiffs have met their burden.

Plaintiffs do not argue that carrying a firearm is a part of their religion, or that the right to carry a firearm is a belief rooted in religion.  Indeed, at no point do they argue that the Challenged Provision of the CCIA actually burdens their religious practices or beliefs.  During the hearing on October 28, 2022, Plaintiffs stated that carrying a gun is "certainly not something sacramental, or on the same level" and that carrying a gun is not "part of the liturgy."  (Doc. 63 at 55:17-56:7.)  Further, Ornstein admitted in a sworn declaration that since the enactment of the CCIA, he has attended shul without carrying a firearm.  (Ornstein Supp. Decl. ¶ 6).  Instead, Plaintiffs claim a violation of the Free Exercise Clause because carrying a firearm inside a house of worship furthers the "broader objectives and tenants of [their] religion."  (Doc. 63 at 56:4–7.) However, Plaintiffs fail to explain how carrying a firearm is tied to and furthers the broader objectives and tenants of their religion.  This statement is so general and conclusory as to be devoid of substance and is therefore insufficient to demonstrate an infringement of their rights under the Free Exercise Clause.[22] *See Bremerton Sch. Dist.*, 142 S. Ct. at 2421.

---

[22] Even if I were to give credence to Plaintiffs' assertion that carrying a firearm inside a house of worship furthers the "broader objectives and tenants of [their] religion," at most the Challenged Provision would be an incidental

In addition, in order to substantiate a free exercise claim Plaintiffs must demonstrate that the government "burdened [their] sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Id.* at 2422 (internal quotation marks omitted). Plaintiffs have failed to show that the State has burdened their "sincere religious practice," and that the CCIA is not "neutral or generally applicable." *Id.*

Plaintiffs' claim that their religious practice is burdened by the Challenged Provision of the CCIA because they would prefer to worship while carrying a firearm does not establish a free exercise claim. Having a preference to worship while carrying a firearm is not a religious practice. Indeed, Plaintiffs' claim of burden to their religious practice is clearly deficient when compared to the facts and holdings in two recent cases where the Supreme Court found that religious belief and behavior was burdened by the State in violation of the Free Exercise Clause. First, in *Bremerton School District,* the Court found that "no one question[ed]" that the Plaintiff had carried the burden of showing that a government entity had burdened his "sincere religious practice" by showing that the school district had disciplined him for "giving thanks through prayer." *Bremerton School District,* 142 S. Ct. at 2422 (internal quotation marks omitted). Second, in *Roman Catholic Diocese of Brooklyn*, the Plaintiff demonstrated that State action had capped attendance and physically restricted individuals from attending houses of worship. *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 66. In other words, the statute in question prohibited individuals from practicing their religion in their houses of worship. Carrying a gun is not a religious act and cannot be analogized to praying or being able to enter one's house of worship. Therefore, Plaintiffs fail to allege a burden on their religious practice.

---

burden on their religious observation.

Plaintiffs' inability to meet their burden to demonstrate state action resulting in burden to their religious exercise is fatal to their free exercise challenge. Even if that were not the case, however, Plaintiffs' free exercise claim fails because the CCIA is a "neutral law of general applicability." *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879 (1990). The CCIA lists both religious and secular locations as Sensitive Locations, and places identical firearm restrictions on both. Under the CCIA, individuals of any religion or no religion are identically prohibited from carrying firearms in houses of worship, libraries, public playgrounds, and homeless shelters (among other locations). There is no indication in the law, the legislative history, or history of regulation that suggests that the CCIA was created to target religion either directly or indirectly. *See Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246, 2256 (2020). In contrast, the Court struck down the regulatory scheme in *Roman Catholic Diocese of Brooklyn* for "sing[ling] out houses of worship for especially harsh treatment," where the executive order capped attendance to 10 people per religious service in (or 25 in "orange zones"), compared to secular businesses such as stores, restaurants/bars, and bicycle repair stores, which were permitted to admit "as many people as they wish[ed]." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 66. The CCIA does not uniquely burden or target religious groups, nor are places of worship targeted for disparate or harsher treatment than secular locations. In this case, the CCIA is a law of neutral and general applicability.

As Plaintiffs have not carried their burden of showing that their sincerely held religious beliefs have been burdened by the State, and because I find that the law is a neutral law of general applicability, I find that Plaintiffs fail to demonstrate a likelihood of success on their First Amendment Free Exercise Claim.

### c. Equal Protection Clause

The Fourteenth Amendment's Equal Protection Clause provides "that no state shall deny to any person within its jurisdiction the equal protection of the laws," directing that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). To plead an equal protection claim, a Plaintiff must "show adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008) (internal quotation marks omitted). Plaintiffs must also prove "that the decisionmakers in [their] case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). To plead a religion-based claim under the Equal Protection Clause, as Plaintiffs attempt to do here, they must plausibly allege that a government actor intentionally discriminated against them on the basis of their religion. *Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 166 (2d Cir. 2001); *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 139–140 (2d Cir. 1999) ("In order for plaintiff to prevail on his claims for violation of the Fourteenth Amendment's Equal Protection Clause . . . proof of [ ] discriminatory intent is required.").

Plaintiffs' equal protection claim fails for two reasons. First, Plaintiffs fail to make a showing of differential treatment between them and other similarly situated individuals. Plaintiffs claim that the Challenged Provision "singles out for different treatment persons engaging in religious activity from those who are not." (Doc. 5 at 26.) Plaintiffs are wrong. The Challenged Provision applies to all individuals, regardless of their religious beliefs, practices, or identity. Individuals of all religions or no religion are forbidden from possession of firearms in

places of worship.  Furthermore, the CCIA does not only prohibit the possession of firearms in places of worship but also a series of secular and nonreligious, public and private locations.  The provisions and exclusions of the CCIA apply identically across the Sensitive Locations.  In other words, certain locations are not treated more or less harshly under the law.  Plaintiffs have failed to plead the existence of similarly situated comparators that have been treated differently by this law.  Thus, their Equal Protection claim cannot succeed.

Second, even if Plaintiffs could show differential or selective treatment, they cannot show that such "treatment was based on impermissible considerations such as . . . religion." *Knight*, 275 F.3d at 166 (internal quotation marks omitted).  Apart from conclusory statements, such as stating that the Challenged Provision is "targeting locations where religious activity takes place," and "singles out for different treatment persons engaging in religious activity from those who are not," Plaintiffs have not pled any facts nor provided any evidence suggesting that Defendants were motivated by religious considerations, never mind religious animus or discriminatory purpose.  (Doc. 5 at 26.)  Plaintiffs fail to make the necessary initial showings of disparate treatment and impermissible government considerations on the basis of religion to support their equal protection claim.  Therefore, I find that Plaintiffs are not likely to succeed on their equal protection claim.

### d.  Fourteenth Amendment – Void for Vagueness

The Government violates the Due Process Clause of the 14th Amendment when it takes away someone's life, liberty, or property "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  The doctrine focuses on providing actual notice to citizens and requiring that the legislature establish "minimal guidelines

to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (internal quotation marks omitted). "The Supreme Court has cautioned that this doctrine does not require 'meticulous specificity' from every statute . . . as language is necessarily marked by a degree of imprecision." *Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2d Cir. 2007) (*citing Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Statutes carrying criminal penalties or implicating the exercise of constitutional rights "are subject to a 'more stringent' vagueness standard than are civil or economic regulations." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015).

One threshold question is whether Plaintiffs may bring this challenge as an "as-applied" challenge, or if they will have to bring this as a "facial challenge." In an "as-applied" challenge, the challenger asserts that the "law cannot constitutionally be applied to the challenger's individual circumstances." *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018). The typical claim is that the challenged "statute provided insufficient notice that [the] conduct was illegal." *Id*. In a "facial" challenge, the challenger claims "that a statute is so fatally indefinite that it cannot constitutionally be applied to anyone." *Id*. A facial challenge is "the most difficult challenge to mount successfully" because, as a general matter, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Hoffman Estates v. Flipside*, 455 U.S. 489, 495 (1982) (explaining that an ordinary facial challenge will succeed "only if the enactment is impermissibly vague in all of its applications"). The Supreme Court has warned that "when considering a facial challenge it is necessary to proceed with caution and restraint, as invalidation may result in unnecessary interference with a state regulatory program." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). "[A] state statute should not be deemed facially invalid unless it is not

readily subject to a narrowing construction. . . . " *Id.*

Here, Plaintiffs assert both an as-applied and a facial challenge to the Challenged

Provision, focusing their arguments on the ambiguity of the term "religious observation,"

arguing that it "is so vague that it potentially applies to any location where someone engages in

religious observance, however slight."[23]  (Doc. 5 at 25.)  Plaintiffs argue that they should be

allowed to assert a pre-enforcement as-applied challenge to the CCIA for vagueness.  (Doc. 5 at

24–26 (*citing Copeland*, 893 F.3d at 111).)  "Courts consider prospective, as-applied vagueness

challenges comparatively infrequently.  Unlike the ordinary as-applied challenge, where the

claim is that a prior enforcement action was invalid, a prospective as-applied challenge seeks to

prove that a statute cannot constitutionally be applied to a specific course of conduct that the

challenger intends to follow."  *Copeland*, 893 F.3d at 112; *see also Expressions Hair Design v.*

*Schneiderman*, 581 U.S. 37, 44 (2017).  Further, in *Copeland*, the Second Circuit noted that

prospective as-applied challenges were of "narrow scope" and that "the sweeping relief sought"

by plaintiffs persuaded the panel that their challenge was not an as-applied challenge but a facial

challenge.  *Copeland*, 893 F.3d at 112–13.

Plaintiffs fail to assert a prospective, as-applied challenge.  Unlike the narrow challenge

and relief sought by the plaintiffs in *Expressions Hair Design*, the claim for relief here is

exceedingly broad.  Plaintiffs do not seek a narrow declaration that the Challenged Provision of

the CCIA cannot be applied to certain situations where they wish to personally carry a firearm in

a place of worship, but for injunctive relief that enjoins enforcement of the Challenged Provision

---

[23] The New York Legislature amended the Challenged Provision, with the amendment taking effect on May 3, 2023.
The amendment struck the term "or religious observation" and added the language "except for those persons
responsible for security at such place of worship".  Given the New York State Legislature's amendment of the CCIA
to strike the phrase "religious observation," I need not address the arguments raised by Plaintiff on why the
"religious observation" language of the statute renders the Challenged Provision unconstitutionally vague.

of the CCIA on the basis that it is unconstitutional.  *See Copeland*, 893 F.3d at 112.  I conclude, like the Circuit did in *Copeland*, that Plaintiffs' challenge "more resembles a facial challenge than an as-applied challenge."  *Id.*  Thus, I apply the more challenging standard for reviewing a facial vagueness claim to Plaintiffs' void for vagueness claim and require that Plaintiffs show that "no set of circumstances exists under which the Act would be valid."  *Salerno*, 481 U.S. at 745.

I find that the CCIA's language prohibiting concealed carry in a "place of worship" is not impermissibly vague.  The phrase "place of worship" is well defined, and has been used in numerous cases to describe structures and spaces where individuals or groups of people congregate to worship.  For example, in *Calvary Chapel Dayton Valley v. Sisolak*, the Court discussed Nevada's COVID-restrictions and described limitations on indoor worship services as "the 50-person limit imposed on places of worship."  *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2604 (2020); *see also S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) ("The State's spreadsheet summarizing its pandemic rules even assigns places of worship their own row.")  The HarperCollins dictionary defines a "place of worship" as "a building where people gather to worship together, such as a church, synagogue, or mosque."  *Place of Worship*, HARPERCOLLINS DICTIONARY, https://www.collinsdictionary.com/dictionary/english/place-of-worship (last visited Jun. 27, 2023).  In response to questioning during the show cause hearing, Plaintiffs' counsel read the definition of a "place of worship" from a Wikipedia page titled "place of worship."  (*See* Doc. 63 at 32:23-33-4.) ("According to Wikipedia, a 'place of worship' is:  'A 'place of worship' is a specifically designed structure or space where individuals or a group of people, such as a congregation, come to perform acts of devotion, veneration, or religious study.  A building

constructed or used for this purpose is sometimes called a 'house of worship.'"") (*citing Place of Worship*, WIKIPEDIA, https://en.wikipedia.org/wiki/Place_of_worship (last visited Jun. 27, 2023)).)

From this, it is clear that the term "place of worship" has a long history of being used within a legal context and also has a clear and broadly understood common meaning. Thus, there is no risk that individuals will not be put on notice by the text of the Challenged Provision, or that the wording of the law would encourage arbitrary enforcement. As cannot be said that there are no set of circumstances under which the CCIA would be valid, I find that Plaintiffs are not likely to succeed on a claim that the Challenged Provision is unconstitutionally vague.

### 3. Public Interest

Finally, Plaintiffs must demonstrate "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Where the State is the opposing party, the balance of the equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party."). *Nken* applies both when a federal official or a state official is an opposing party in a lawsuit. *See Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) (merging balance of equities and public interest factors where Connecticut state officials opposed a motion for a preliminary injunction); *see also Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) ("The final two factors merge when an injunction is to be issued against the government.") In assessing this factor, I must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal citations

and quotation marks omitted).

     Governor Hochul and Lieutenant Governor Delgado stated in a press release about the CCIA that it was passed to "protect New Yorkers," and that "keeping the people of New York State safe" was their greatest priority. *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*¸ GOVERNOR.NY.GOV (Jul. 1, 2022), https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions. At the same event, Senate Majority Leader Andrea Stewart-Cousins added that "New York will continue to prioritize people's safety and lives." *Id.* It is well established that states have "substantial, indeed compelling, governmental interests in public safety and crime prevention." *New York State Rifle & Pistol Ass'n, Inc.*, 804 F.3d at 261. The Supreme Court has repeatedly acknowledged that governments have a compelling interest in protecting public safety and crime prevention. *See e.g. Salerno*, 481 U.S. at 745 (federal government has "compelling interests in public safety"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted. We have stressed before that crime prevention is a weighty social objective" (internal citations and quotation marks omitted)). The Supreme Court recognized the connection between regulating firearms and public safety in *Heller*, stating "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns" and that "gun violence is a serious problem." *Heller*, 554 U.S. at 636.

     There is also a public interest in avoiding violations of constitutional rights, as the "Government does not have an interest in the enforcement of an unconstitutional law." *See New York Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 488 (2d Cir. 2013) (quoting *Am. Civil*

*Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).  However, as I have found that Plaintiffs fail to demonstrate a likelihood of success on any of their claims involving violations of constitutional rights, I need not consider this when considering the balance of equities and public interest.

The New York State Legislature has acted in what they consider to be in the best interest of public safety.  It is my role to then consider the claims of irreparable harm, the likelihood of success on the merits, and to balance the competing claims of injury and the public consequences of granting injunctive relief.  In this case, for the reasons stated above, I find that the equities and the public interest weigh against the injunctive relief Plaintiffs seek.

### III.  Conclusion

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction is DENIED.

SO ORDERED.

Dated: June 28, 2023
      New York, New York

Vernon S. Broderick
United States District Judge